# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs December 17, 2024

## STATE OF TENNESSEE v. RAYMOND SCOTT KNOX

**Appeal from the Circuit Court for McMinn County**
**No. 22-CR-113          Andrew M. Freiberg, Judge**

**No. E2024-00428-CCA-R3-CD**



FILED

FEB 18 2025

Clerk of the Appellate Courts
Rec'd by

In 2023, the Defendant, Raymond Scott Knox, pleaded guilty to eleven counts of methamphetamine and weapons related charges, and the trial court sentenced him to an effective sentence of sixty-five years of incarceration. On appeal, the Defendant asserts that the trial court erred when it sentenced him. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., S.J., and J. ROSS DYER, J., joined.

J. Liddell Kirk, Madisonville, Tennessee (on appeal), and Nicholas Poe-Jones, Cleveland, Tennessee (at trial), for the appellant, Raymond Scott Knox.

Jonathan Skrmetti, Attorney General and Reporter; Raymond J. Lepone, Assistant Attorney General; Shari Lynn Tayloe, District Attorney General; and Ashley M. Ervin, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the Defendant's participation in the sale and distribution of methamphetamine over the course of three months in and around his residence and involving several of his family members. For these offenses the Defendant, along with multiple co-defendants, was indicted for: one count of conspiracy to sell or deliver 300 grams or more of methamphetamine, one count of unlawful possession of 300 grams or more of methamphetamine, two counts of unlawful possession of twenty-six grams or more of methamphetamine with intent to sell or deliver, five counts of unlawful possession of .5 grams or more of methamphetamine with intent to sell or deliver, one count of unlawful

possession of Alprazolam with intent to sell or deliver, one count of being a felon in possession of a firearm during the commissions of or attempt to commit a dangerous felony, and one count of possession of a firearm by a convicted felon with a prior felony drug conviction.

## A. Guilty Plea

The Defendant pleaded guilty to all the indicted charges except the unlawful possession of Alprazalom, which was dismissed. The State recited the following facts as the basis for the plea:

The investigation would have shown that, even before this 2021 date, agents with the Drug Task Force were receiving information about [the Defendant] dealing out of Niota, and he would come up in interviews. However, traditional means of investigations were not successful. Surveillance was nearly impossible because of the way his house was positioned. He did not have drug traffic, that made it readily identifiable as an individual who distributes narcotics. . . . [T]here were not individuals who could purchase from him. Those traditional means had failed. He ran a very insulated operation. The TBI . . . began working with the drug task force and they made application for Title 3 authorization to intercept communications related to his phone number. That authorization was received on August 31 of 2021, and that's when the wiretap portion of the investigation began. That involved agents with the TBI, the drug task force, and local law enforcement, specifically the McMinn County Sheriff's Department, that worked day-in and day-out, whether it be on surveillance, whether it be at the listening post, to monitor [the Defendant's] distribution and learn about his organization. It was during the course of that that on September 11th, 2021, there was an intercepted communication between Jonathan Knox, [the Defendant's son], and Melissa Skinner, [the Defendant's fiancée], during which time there was a discussion about the distribution of an 8-ball that Jonathan Knox had found. Skinner called [the Defendant] to talk about the distribution of that, to talk about him needing an 8-ball, and orchestrating that distribution. On September 16th, the surveillance team, and through communications, observed Daniel Gable, a customer of [the Defendant's], on his motorcycle at [the Defendant's] house. They observed him leave, initiated a traffic stop, and found in his possession approximately 4 grams of methamphetamine. Daniel Gable, that same night, contacted [the Defendant], reported the traffic stop, and let him know about it. On October the 19th, there was communications intercepted between Jonathan Knox, the Defendant's son, and [the Defendant], about the distribution of methamphetamine, talking

2

about coming over, I'm going to pick that up that I didn't get the other night, and distribute that. So, officers were able to conduct surveillance, see Jonathan Knox, initiate a traffic stop when he left the house, and he was found to be in possession of approximately 3.5 grams of methamphetamine. After these traffic stops, which took place as enforcement actions during the course of wiretap investigation, there was ultimately a search warrant executed. It was signed on November the 4th, executed on the morning of November the 5th at the residence of [the Defendant]. On that day, officers, agents had seen Douglas Hutchinson leave the residence of [the Defendant]. We have reason to believe that Hutchinson would be there through intercepted communications about them coming together that morning. Because we had reason to believe that Kenneth Huckabee, the source of [the Defendant's] methamphetamine, had traveled from Rome, Georgia, through Flock cameras in the days leading up to that, and given [the Defendant] a resupply of methamphetamine. So, on that November 5th date when officers observed the vehicle known to be used by Douglas Hutchinson leave that residence, they initiated a traffic stop. They did, in fact, come into contact with Douglas Hutchinson, who possessed not only a firearm but 2 ounces of methamphetamine. They made contact with [the Defendant] in the driveway of that residence, and he was cooperative. He told law enforcement where his methamphetamine was, which was stored in an outbuilding behind the residence, and stored in a propane tank, and out there was just shy of 4 kilograms of methamphetamine, packaged in Ziploc baggies. I say just shy because it was missing the 2 ounces that he had just sold to Douglas Hutchinson. That was found there along with additional paraphernalia; the baggies, the scales, and many firearms that were in the house. Some were, one was in the out-building, and multiple were in the actual residential structure.

Both the trial court and defense counsel inquired as to whether the Defendant understood that the trial court would be determining his sentences. The trial court informed the Defendant that he was a Range II offender and inquired as to whether he understood sentencing ranges and wished to enter his pleas on that condition. On this basis, the trial court accepted the Defendant's guilty pleas.

### B. Sentencing

The trial court held a sentencing hearing during which it admitted into the record the presentence report and judgments from the Defendant's prior convictions. The Defendant had previous convictions for felony manufacturing and distribution of methamphetamine offenses in state and federal court over the course of twenty years. He

3

had received alternative sentences or community supervision sentences for several of his prior convictions. The following evidence was presented at the hearing: Joshua Orlowski testified that he was employed by the TBI and later by the Drug Enforcement Administration as a task force officer. As part of an investigation, Officer Orlowski was surveilling the Defendant's telephone communications as part of a drug trafficking organization. Officer Orlowski identified the Defendant's supplier in Georgia, whom the Defendant had met while in federal custody. Evidence indicated that the Defendant was in a "position of command" within the organization. The Defendant transported methamphetamine from his supplier's location in Georgia to McMinn County, Tennessee using propane tanks as his method of concealment. In Officer Orlowski's experience, this indicated a level of sophistication of the operation.

When officers executed a search warrant on the Defendant's residence, they found the bulk of the methamphetamine in a small secondary building, which Officer Orlowski referred to as an "insulation tactic" to separate the drugs from the perpetrator to make it more difficult for law enforcement to identify the source or supplier. Officer Orlowski obtained the Defendant's tax records, which indicated he had not reported wages in five years and yet, on his property, the Defendant had a boat, automobiles, and a newly constructed garage. Investigators seized $22,000 worth of methamphetamine from the Defendant's property, which would have grossed him approximately $65,000 upon resale. Investigators also located multiple firearms on the property and inside the Defendant's primary residence.

Several witnesses testified on behalf of the Defendant, stating that he had been a positive influence on their lives and had encouraged them not to use drugs. The Defendant made a statement to the court and apologized for his behavior. He stated that he had PTSD and asked for the court's mercy.

At the conclusion of the hearing, the trial court made the following statement:

> First, trial court is to consider all evidence received at a trial and/or plea hearing and sentencing hearing.
>
> . . . .
>
> [The Defendant] refused any kind of plea multiple times. But the facts in this case are that [the Defendant] locally was, if you will, the kingpin of a very vast methamphetamine trafficking network. . . . . We're talking about a real business-like operation.
>
> . . . .

4

I am going to find Enhancement Factor Number 1, that he does have criminal conduct and convictions in excess necessary to establish his Range II multiple-offender status. . . . . I put great weight to as it relates to the enhancement factor.

Similarly, I do find Enhancement Factor Number 8. . . . . He was released into the community under conditions of bond. He behaved erratically. He caused concern for the Courts. . . . . [As] a convicted felon, he was caught with a weapon when he was seized on the bench warrant, and he had the product consistent with and the cash, all indicating subsequent trafficking. So I find that Enhancement Factor Number 8 as well. Put great weight to those two. I am going to find some mitigation. I'm going to put that under Mitigating Factor 13.

. . . .

I think it's clear that he's a high risk of re-offense. We're talking about somebody who did 57 months federal time. Someone who has not been very cooperative with any sentencing attempts, and it's all drugs. Exhibits 2, 3, 4, it's all methamphetamine, paraphernalia, related methamphetamine. This is methamphetamine. Best predictor of future success is past performance and it is abundantly clear as he sits at forty seven years of age, that his life is devoted to this as his job, his profession that he is in fact a voluntarily chosen career criminal. . . . . [The Defendant] was the lead and it spread not just to McMinn County, but to neighboring Monroe County, and it spread to neighboring counties. . . . . But we're here because of [the Defendant], the conduct I do find to be aggravated very egregious. . . . . It is horrifying, shocking. It is reprehensible conduct. It is to an excessive and exaggerated degree.

. . . .

The real issue in this case is consecutive sentencing. . . . . I do find well in excess of a preponderance of the evidence, subfactor 1, that the Defendant is a professional criminal who [has] knowingly devoted the Defendants life to criminal acts as a major source of livelihood. He's never had a job, or a stable job. He's never worked. . . . . [H]e just outright admitted to it in his [presentence investigative report], that he was a professional criminal whose livelihood is derived through this trafficking offense, and so I do find based on all this proof that subpart (b)(1) does apply

5

for partial consecutive sentencing. I'm therefore going to, Court has to always keep in mind, it's the least of your measure[s] necessary to achieve justice. We're talking about only prison. He's not eligible for probation as the sentence imposed in all is going to be over ten years, but it does need to reflect justice. Is it proportional. Just because you can do something, or Court can, doesn't mean it should. And this Court finds it appropriate to run Count 3, consecutive to Count 1 and 2. That is 20 years on top of 40 years. Count 11 then also needing to run consecutive to both Counts 1 and 3 for a total sentence of 65 years in the Department of Correction. . . . . I do think that all told, 65 years is proportional and reflects the enhancement, this egregious conduct reflects his criminal history, and is the least severe measure necessary to achieve justice. I think [the Defendant] is just someone who does needs to be restrained and removed from society for as long as possible to keep from his drug trafficking proclivities. So, Count 3 consecutive to Count 1. Count 11 consecutive to both Counts 3 and 1. Maximum sentences[.] That is the judgments and decisions of the Court.

It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant asserts that the trial court erred when it sentenced him. He contends that his sentence is excessive and unreasonable, and that he should be resentenced to a less excessive total effective sentence. He requests a reduction in his forty-year sentence, for the Class A felony, to thirty-five years and a realignment of his sentences for concurrent sentences for Counts 1 and 3. The State responds that the trial court acted within its discretion when it enhanced the Defendant's sentence and when it imposed partial consecutive sentencing. We agree with the State.

"Sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.* at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court

6

sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707.

The misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from a trial court's sentencing decision. *Id.* A reviewing court should not invalidate a sentence on this basis unless the trial court wholly departed from the principles of the Sentencing Act. *Id.* So long as there are other reasons consistent with the purpose and principles of sentencing, a sentence within the appropriate range should be upheld. *Id.*

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant made in the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* T.C.A. § 40-35-210 (2019); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2019).

A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the categories in Code section 40-35-115(b). Consecutive sentencing may be imposed by the trial court only under specified circumstances, including, as relevant here:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood; or

(2) The defendant is an offender whose record of criminal activity is extensive;

Tenn. Code Ann. § 40-35-115(b). This court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" *Pollard*, 432 S.W.3d at 861.

7

When imposing consecutive sentences, the court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. §§ 40-35-102(1), -103(2), -103(4); *State v. Imfield*, 70 S.W.3d 698, 708 (Tenn. 2002). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Pollard*, 432 S.W.3d at 862 (citing Tenn. R. Crim. P. 32(c)(1); *Bise*, 380 S.W.3d at 705).

We conclude that the trial court properly sentenced the Defendant. The trial court carefully considered the relevant principles and sentenced the Defendant to within range sentences for each of his crimes. The trial court applied enhancement factor (1), that the Defendant had an extensive record of criminal activity, based on his numerous prior felony and misdemeanor convictions. T.C.A. § 40-35-114(1) (2019). The trial court applied enhancement factor (8), that the Defendant had failed to comply with prior conditions of release, based on his prior probation violations. T.C.A. § 40-35-114(8) (2019). All the factors were supported by the evidence presented at the sentencing hearing and contained in the presentence report. As such, the appropriate application of enhancement factors supports the trial court's sentencing decision to impose the forty-year sentence for the Class A felony.

As for the alignment of his sentences, the trial court found that partially consecutive sentencing was proper, pursuant to section 40-35-115(b)(2), because the Defendant had a record of extensive criminal activity, including multiple felonies for methamphetamine distribution spanning a long period of time. We agree. The Defendant is not entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

ROBERT W. WEDEMEYER, JUDGE

8